## ENTRY ORDER

SUPREME COURT DOCKET NO. 2013-447

NOVEMBER TERM, 2013

| | | |
|---|---|---|
| State of Vermont | } | APPEALED FROM: |
| | } | |
| | } | |
| v. | } | Superior Court, BenningtonUnit, |
| | } | Criminal Division |
| Vincent D. Costantino | } | |
| | } | DOCKET NO. 1138-10-13 Bncr |
| | } | |
| | | Trial Judge: Nancy S. Corsones |

In the above-entitled cause, the Clerk will enter:

By a written decision issued on November 6, 2013, following a weight-of-the-evidence hearing on October 29, defendant, Vincent Costantino, was held without bail pursuant to 13 V.S.A. § 7553a on charges of aggravated domestic assault, 13 V.S.A. § 1043(a)(1), and domestic assault, 13 V.S.A. § 1042. Defendant appealed and a de novo review was held on November 25, 2013 before Superior Judge John P. Wesley, sitting by special assignment to preside over the single-justice review proceeding as provided by 13 V.S.A. § 7556(d) and Vermont Rule of Appellate Procedure 9.

Defendants may be held without bail under 13 V.S.A. § 7553a when charged with a felony

an element of which involves an act of violence against another person . . . [and] when the evidence of guilt is great and the court finds, based upon clear and convincing evidence, that the person's release poses a substantial threat of physical violence to any person and that no condition or combination of conditions of release will reasonably prevent the physical violence.

Defendant does not dispute that the evidence of guilt is great in this case, but contends the court's denial of release on conditions was not supported by clear and convincing evidence.

At the hearing below, defendant sought to be released under the custody of any of several acquaintances or relatives, all of whom lived in Hoosick Falls, New York: Patricia Schmid-Huber, defendant's tenant of many years; Charles Costantino, his brother who lives next door; or Madalyn Costantino, his mother who resides approximately one-half mile from defendant's residence.

Because the State and the trial judge questioned the enforceability of any conditions of release if defendant's residence continued to be in New York, defendant notified the State of his

intention to call two additional witnesses at the review hearing who would offer to supervise defendant in Bennington, Vermont under strict conditions of release. The State objected at the outset of the hearing, arguing that defendant had ignored the requirement of Vermont Rule of Appellate Procedure 9(b)(1)(F) that he "present the reviewing justice with a memorandum describing any proposed additional evidence at least 24 hours before the hearing." Further, the State maintained that no good cause could be made out for failing to call the additional witnesses at the weight-of-the-evidence hearing.

The reviewing justice allowed defendant to make a further record regarding persons willing to supervise him on conditions of release in Vermont, reserving a ruling on the admissibility of such evidence until this written decision. Matt Bleu, a Bennington resident who once dated defendant's sister, testified he would allow defendant to reside with him while strictly enforcing conditions including abstinence from alcohol, check-in with the police, and no contact with the complaining witness, Tammy Hawk. Mr. Bleu acknowledged defendant's past criminal history and did not regard it as a barrier to his ability to supervise defendant successfully. Mr. Bleu works daily at the body shop he owns, and offered to provide defendant with some work if necessary. A second acquaintance, Carl Capella, age eighty-four and plainly hard-of-hearing, also offered to provide a supervised residence to defendant. He was a friend of defendant's father, and had known defendant since childhood. He was unaware of defendant's criminal history, and had only a vague understanding of the nature of the current charges or proceedings.

Defendant did not comply with the formal notice requirements of Appellate Rule 9(b)(1)(F),[1] nor has he demonstrated good cause for failing to adduce the testimony of Mr. Bleu and Mr. Cappella at the weight of the evidence hearing. See State v. Madison, 163 Vt. 390, 392 (1995) (lack of time to prepare for short-notice weight of evidence hearing is not good cause). The analysis below excludes any consideration of defendant's offer of two Bennington residents to supervise his release on conditions, except to note, as did the trial court, that the possibility that defendant could secure a residence in Vermont does not undermine the State's clear and convincing showing that conditions of release are unlikely to safeguard the complaining witness.

I.      Findings

The following facts are not contradicted in the current record. Defendant has known Ms. Hawk for approximately thirty years. For approximately two and one-half years prior to his arrest, defendant lived with Ms. Hawk as sexual and domestic partners at his home in Hoosick Falls. Although the relationship started out well, described by Ms. Hawk as including "a lot of fun," it later became characterized by verbal abuse and intolerant behavior on defendant's part, particularly when he was drinking. During one such episode, he destroyed Ms. Hawk's twelve-

---

[1] In a supplemental memorandum filed after the review hearing, defendant submits copies of email notices to Justice Skoglund's chambers, in one of which he states: "We respectfully request that we be allowed to present evidence regarding potential residences within the State of Vermont where Mr. Costantino could reside if the Court determines that he should be released. Given that the weight of the evidence hearing was the day after his arraignment, we did not, at that time, have evidence to present on that issue." These notices are not an adequate substitute for the memorandum required by V.R.A.P. 9(b)(1)(F).

year-old son's Christmas tree. On other occasions, he strewed her personal belongings in the yard after telling her to leave, because she was "no good" and "a loser." On another occasion, defendant almost pushed Ms. Hawk down the stairs after ordering her to leave. Other times, defendant would speak to Ms. Hawk because of his jealousy as to her claimed effect on other men, and insist on an accounting of her whereabouts. Several times Ms. Hawk decided not to come home after defendant sent her text messages warning her that if she did she was "not going to like it."

In August 2013, Ms. Hawk began employment in Woodford, Vermont with Charlie Suss, who is also defendant's employer. In early September 2013, Ms. Hawk moved out of defendant's house because she and defendant mutually agreed to the separation. In the weeks that followed, defendant and Ms. Hawk continued to see one another, and she felt that they were "getting along" better. She agreed to accompany him to a party on October 12, 2013 at the home of their employer. They left the party when defendant had become upset for reasons unknown to Ms. Hawk. On the way home on Notch Road in Woodford, defendant suddenly stopped the car and ordered Ms. Hawk out. When she refused, being concerned at not knowing where she was and how to get home, defendant punched her in the face with a closed fist. He got out of the car, and yelled, "Get the fuck out, cunt" at her. He dragged her out of the vehicle, punched her again and threw her down an embankment. When Ms. Hawk attempted to crawl up the bank, defendant punched her again and threw her back down. This occurred four or five times. At one point, defendant threw Ms. Hawk to the ground, keeping her pinned with his right forearm across her throat. Ms. Hawk attempted to scratch defendant because she was fearful at not being able to breathe. Eventually, another vehicle approached. Ms. Hawk called for help, and the other car stopped. It is unclear what happened to defendant. The passing motorists took Ms. Hawk to the hospital.

As graphically illustrated by the photographs in evidence, taken when the investigating officer interviewed Ms. Hawk at the hospital, defendant's assault on her was brutally vicious—resulting in multiple bruises and lacerations all over her head and upper body, including a bloody tear in the white of one of her eyes.

On October 15, 2013, Trooper Lauren Ronan contacted defendant by telephone in New York, advising him that he was going to be charged with domestic assault. She requested that defendant meet with her later that day at the Shaftsbury, Vermont barracks. Defendant agreed, but did not appear. The State applied for and received an arrest warrant. Defendant surrendered on October 28, was arraigned the same day and initially held without bail. Between learning of the pending charges and being arraigned, defendant attempted to contact Ms. Hawk on several occasions via telephone and text message. While containing no overt threats, the repeated plea in the messages was for Ms. Hawk to contact him. There is no evidence that defendant sought further contact with Ms. Hawk after his surrender and prior to the weight-of-the-evidence hearing.

In 1988, defendant was convicted of rape in Massachusetts. He spent one year in jail, followed by ten years on parole. Defendant was charged in New York with stalking, and entered a plea to a harassment violation. Defendant has two convictions of driving while intoxicated in 1987 and 2006.

## II.    Conclusions of Law

The sole issue on appeal is whether any set of conditions of release will reasonably prevent defendant's threat of physical violence to any person. De novo review of a challenged conclusion requires a justice to reach "an independent decision based on [the] record." Madison, 163 Vt. at 393. The findings clearly and convincingly show that defendant poses a substantial threat of physical violence to Ms. Hawk, which can not reasonably be prevented by conditions of release.

Defendant's prolonged assault against Ms. Hawk was violent in the extreme. The duration of the beating, and defendant's repeated punching and choking of Ms. Hawk while throwing her back down the embankment, can only be characterized as sadistic. As the pictures show, Ms. Hawk was terribly mauled by defendant's assault, which might easily have posed a lethal risk but for the appearance of good Samaritans in the form of the chance approach of another vehicle. This reviewing justice concurs with the trial court's assessment that the degree of violence, coupled with the seeming disconnection between the ferocity of defendant's rage and any prior act on the part of his victim, raises significant questions as to his capability to control similar urges if released, notwithstanding any judicial order precluding contact.

Defendant's respect for legal authority remains particularly suspect in consideration of his criminal history. He spent eleven years under correctional supervision for rape. He seeks to underplay the significance of this earlier crime characterized by violence and profound disrespect for the victim, emphasizing the time since the conviction and his successful completion of parole. This Court draws a different inference. Having a serious felony already on his record, defendant might have been expected to conduct his affairs very cautiously with regard to keeping his behavior lawful. To the contrary, in 2006 he was convicted of his second drunk driving offense, having been deterred neither by the prior conviction of the same offense in 1987, nor by the 1988 rape conviction. In this vein, he can not successfully minimize a prior offense for harassment, which was pled down from a stalking charge. Much of the time during which defendant has known Ms. Hawk has been characterized by only intermittent respect for legal constraints. Much of the time during which he lived in the same house with Ms. Hawk has been characterized by only intermittent respect for her personal integrity. His departures from legal norms clearly and compellingly demonstrate that whether under the compulsion of alcohol, or under the compulsion of a fixated impulse to command the circumstances at hand, defendant has a well-established history of violent or potentially dangerous law-breaking.

Against this background of historic impulsiveness, culminating in defendant's recent horrific outburst against Ms. Hawk, offers of supervision by relatives and friends, no matter how earnest, afford inadequate protection against further danger to the complaining witness. As a practical matter, none of those willing to assume responsibility for defendant's supervision can continuously monitor his behavior. Defendant's ill-advised efforts to discuss matters with Ms. Hawk while delaying surrender on the arrest warrant are additional telling signs of his impulse to control her. That they contained no overt threat does not eliminate the inference of what had become implicit in their relationship, especially as that relationship finally exploded into outrageous violence: oppose me and I will hurt you. The Court can not conclude that any

conditions will safeguard Ms. Hawk against the mindset exemplified by the circumstances described in the findings.

For the reasons stated herein, defendant shall continue to be held without bail pursuant to 13 V.S.A. § 7553a.

FOR THE COURT:

John P. Wesley, Superior Judge,
Specially Assigned